UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>Antaeus Enterprises, Inc.
and James H. Rand</u>

     v.                      Civil No. 10-cv-126-JL
                                   Opinion No. 2011 DNH 050

<u>L. John Davidson</u>

**<u>MEMORANDUM ORDER</u>**

The question in this case is whether judgment creditors of a limited liability company can hold the company's owner personally liable for the judgment by "piercing the corporate veil." Plaintiffs Antaeus Enterprises, Inc. and James H. Rand recently obtained a default judgment against SD-Barn Real Estate, LLC for damages allegedly caused by its failure to timely pay them money due under certain promissory notes.  See <u>Antaeus Enters., Inc. v. SD-Barn Real Estate, LLC</u>, No. 05-6396 (S.D.N.Y. Apr. 11, 2007). Unable to collect the judgment from SD-Barn, an admitted "shell corporation" with no assets or business activities, they brought this suit against SD-Barn's sole member, defendant L. John Davidson, seeking to pierce the corporate veil and recover the judgment from him personally.  This court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity).

Plaintiffs have now moved for summary judgment, see Fed. R. Civ. P. 56, arguing that they can pierce the corporate veil as a matter of law because the record shows that Davidson used SD-Barn

to perpetrate a fraud and injustice, diverting to himself money that SD-Barn owed to them.  See, e.g., LaMontagne Builders, Inc. v. Bowman Brook Purchase Group, 150 N.H. 270, 275 (2003) (courts "will pierce the corporate veil and assess individual liability . . . where the corporate identity has been used to promote an injustice or fraud").[1]  After hearing oral argument, this court denies the motion.  Davidson has offered a competing explanation for his conduct that, while not fully compliant with SD-Barn's obligations under the promissory notes, could be construed as neither fraudulent nor unjust.  Because material facts thus remain in dispute, plaintiffs' veil-piercing claim cannot be resolved on summary judgment.


I.  **Applicable legal standard**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  An issue is "genuine" if it could

---

[1]Both parties agree that the veil-piercing claim is governed by New Hampshire law, since that is the state where SD-Barn is registered.  See, e.g., Archdiocese of San Salvador v. FM Int'l, LLC, 2006 DNH 102, 18 n.13 (DiClerico, D.J.) (citing Goya Foods, Inc. v. Unanue, 233 F.3d 38, 43 n. 4 (1st Cir. 2000), and 1 William Meade Fletcher, Fletcher Cyclopedia of Private Corporations § 41.90, at 696-97 (rev. ed. 1999)).

reasonably be resolved in either party's favor at trial, and "material" if it could sway the outcome under applicable law. Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).  Where, as here, plaintiffs seek "summary judgment on claims for which they, as plaintiffs, would bear the burden of proof at trial," they "cannot attain summary judgment unless the evidence that they provide is conclusive."  Zimmerman v. Puccio, 613 F.3d 60, 70 (1st Cir. 2010); see also Village Press, Inc. v. Stephen Edward Co., 120 N.H. 469, 471 (1980) (stating that plaintiffs bear the burden of proof on veil-piercing claims under New Hampshire law).

In evaluating a summary judgment motion, the court must "view[] all facts and draw[] all reasonable inferences in the light most favorable to the nonmoving party." Estrada, 594 F.3d at 62.  Nevertheless, plaintiffs argue that this court must accept their version of the facts because Davidson, who is appearing pro se, did not submit any affidavits or other properly authenticated evidence with his objection.  See L.R. 7.2(b)(2). But in the earlier case that resulted in the default judgment against SD-Barn, where Davidson had counsel, he submitted an affidavit and deposition testimony that set forth his own version of the facts.  This court will consider those materials in evaluating plaintiffs' motion.  See, e.g., Dutil v. Murphy, 550 F.3d 154, 158 (1st Cir. 2008) (noting that courts "endeavor,

within reasonable limits, to guard against the loss of <u>pro</u> <u>se</u> claims due to technical defects"); <u>Gilroy v. Kasper</u>, <u>654 F. Supp. 2d 44, 46 n.2 (D.N.H. 2009)</u> (accepting late-filed affidavit because of party's <u>pro</u> <u>se</u> status).[2]

## II.  <u>Background</u>

In the early 1990s, having enjoyed a successful career in real estate development, Davidson embarked on a new business venture seeking to develop and market a technique for pasteurizing chicken eggs.  He initially conducted the venture as a limited partnership, Pasteurized Eggs LP.  In 2001, hoping to raise additional funds, he formed a new corporation, Pasteurized Eggs Corporation ("PEC"), of which he became the president, chief executive officer, and chairman of the board of directors, as well as the largest shareholder.  PEC struggled financially, however, and Davidson lasted only nine months in his management role before the board (on which plaintiffs Antaeus and Rand each had a seat) removed him.  Nevertheless, Davidson remained the company's largest shareholder.

By fall of 2002, PEC was exploring the possibility of filing a petition for reorganization under Chapter 11 of the United

---

[2]This court need not rule on plaintiffs' objections to the other materials that Davidson submitted with his summary judgment briefs, because the court did not rely on those materials in ruling on the motion.

States Bankruptcy Code, which it eventually did.  See In re
Pasteurized Eggs Corp., No. 02-13086 (Bankr. D.N.H. Oct. 5,
2002).  Davidson met with PEC's board to discuss financing
options.  They agreed that PEC would take out a $700,000 debtor-
in-possession ("DIP") loan, with half of the money coming from
Davidson[3] and the other half coming from Antaeus, Rand, and two
other investors (one of whom is now deceased, and the other
incapacitated).  SD-Barn, a limited liability company that
Davidson had formed several years earlier but had never used,
served as a conduit for the loan.  The investors loaned the money
to SD-Barn (in exchange for promissory notes), which in turn
loaned the money to PEC (in exchange for a separate note).

By Davidson's own admission, SD-Barn was merely a "shell
corporation," with no assets, no employees, no regular meetings,
and no business activities other than serving as a conduit for
the DIP loan.  Davidson was its sole member and the only person
responsible for its activities.  If he needed assistance in
carrying out those activities (e.g., accounting), he relied on
the employees of his other businesses.  Davidson claims that the
other DIP lenders were "fully aware of the status and

---

[3]In his affidavit, Davidson acknowledges that the
contribution made to the DIP loan by another investor, Frederick
Flather, "is considered to be part of my contribution," so this
court will treat it as such and will not discuss Flather
separately.

characteristics of SD-Barn" and, indeed, sought assurances from him that the company would serve no other purpose during the term of the loan.

Even with the DIP loan, PEC could not raise the funds necessary to reorganize under Chapter 11.  Instead, PEC agreed in 2003 to sell substantially all of its assets to National Pasteurized Eggs, LLC ("NPE"), which was then the sole licensee of its pasteurization technology.  See In re Pasteurized Eggs Corp., No. 02-13086 (Bankr. D.N.H. July 25, 2003) (approving the sale).  As part of that transaction, NPE assumed PEC's obligation to repay the DIP loan.  NPE made an up-front payment to SD-Barn of $200,000 and issued a promissory note for the remaining balance (about $590,000, which included accrued interest).  The note required that NPE make interest payments to SD-Barn on a monthly basis for the term of the loan, pay half of the outstanding principal in July 2004, and finally pay the other half in July 2005.

After deducting expenses, SD-Barn distributed NPE's initial $200,000 payment to the DIP lenders on a pro rata basis and then issued amended and restated promissory notes for the remaining balances owed to each of them (including approximately $85,000 each for Anteaus and Rand).  The amended notes required SD-Barn, upon receiving any further payments by NPE, to distribute those payments to the lenders on a pro rata basis within five days.  In

6

the event that SD-Barn failed to distribute those payments within ten days of the due date, the notes provided that SD-Barn would be deemed in default and that the lenders would have a "right of acceleration," meaning that "all sums payable under [the note would] become immediately due and payable [by SD-Barn] without further notice or demand."

NPE made monthly principal payments to SD-Barn throughout the term of the loan, totaling about $44,000. SD-Barn failed, however, to distribute those payments to the other DIP lenders on a pro rata basis. Instead, SD-Barn transferred them into Davidson's personal bank accounts. The same thing happened with NPE's first principal payment in July 2004. Shortly after that payment, Davidson brought suit against Rand, Antaeus, and various other parties in New Hampshire Superior Court, alleging that they misappropriated his intellectual property and committed various other torts in connection with PEC's demise. See Davidson v. Rand, No. 04-C-805 (N.H. Super. Ct. Sept. 17, 2004). Rand and Antaeus claim that Davidson withheld the NPE payments from them in retaliation for that alleged mistreatment and also to give himself greater leverage in the New Hampshire Superior Court litigation.[4]

---

[4]Davidson has since become involved in several more cases relating to PEC's demise, including at least one currently pending before this court. See Nat'l Pasteurized Eggs, LLC v. Davidson, 2011 DNH 009.

Davidson, however, claims that he was simply preoccupied with a personal tragedy:  one of his daughters was dying of cancer.  He temporarily relocated from New Hampshire to Texas in early 2004 to be with her.  To make matters worse, in August 2004, shortly before his daughter died (and just after NPE's first principal payment), Davidson himself suffered a stroke and was hospitalized.  He suffered another stroke, which left him blind, in September 2004, just after his daughter died.  Under the circumstances, he "decided that it would be better--with my inability geographically, physically, and in every other way--to attend to the issues of the DIP [loan] at a later time and authorize my bookkeeper . . . to pay me off [with NPE's first principal payment] and to earmark the next payment for" the other DIP lenders, knowing that he and they were each entitled to half of the principal and thus would all be paid in full, albeit not at the same time (and not in accordance with the terms of the promissory notes).

As for the monthly interest payments, Davidson believed it was proper for SD-Barn to distribute them to him as "partial payment" for the expenses that he incurred in connection with the DIP loan (including, most notably, legal fees in excess of $10,000).  The notes provided that SD-Barn "shall deduct from the outstanding amount due under this note a pro rata proportion of expenses incurred . . . in relation to [each lender's] share of

the obligations." Davidson believed that those expenses would exceed the other lenders' share of the interest payments (about $22,000). He planned a final accounting of the loan after NPE's second principal payment, and after his health improved, at which time any amounts owed by or to the other lenders could be calculated.

Davidson never communicated these plans to the other DIP lenders. He admits that he was, and still is, upset with them for failing to contact him to see how he was doing after his two strokes. Fearing that Davidson planned to keep all of NPE's payments for himself, the other lenders sent him letters in 2005 demanding that SD-Barn immediately distribute their pro rata shares of NPE's past payments, and that it instruct NPE to make all future payments directly to them, not to SD-Barn. But SD-Barn did not respond to the letters, or take either of the requested actions.[5] Davidson recalls that he "just didn't pay any attention" to the issue, "knowing full well that a [second principal] payment of equal amount would be forthcoming" in July

---

[5]There is a factual dispute over exactly what Davidson told NPE with regard to the future payments. Both parties agree that he did not expressly instruct NPE to make the payments directly to the other DIP lenders (though Davidson seemed to suggest otherwise at oral argument). Davidson claims, however, that he had "no ability" to give that instruction and that, in discussing the issue with NPE, he "never voiced any objection" to direct payment.

2005 and would be distributed to the other lenders, making everyone "even-steven in [his] mind."

About two weeks before the deadline for NPE's second principal payment, the other DIP lenders sued SD-Barn and Davidson in the United States District Court for the Southern District of New York, seeking a declaration of their rights under the promissory notes and asserting claims for breach of contract against SD-Barn, tortious interference with contract against Davidson, and conversion against both defendants.  See Antaeus Enters., Inc. v. SD-Barn Real Estate, LLC, No. 05-06396 (S.D.N.Y. July 13, 2005).  They also named NPE as a nominal defendant. With the district court's approval, NPE deposited the second principal payment into the court's registry in September 2005, and was voluntarily dismissed from the case by stipulation of the parties.

SD-Barn and Davidson initially moved to dismiss the case for lack of personal jurisdiction or to transfer it to New Hampshire, their home state, but the district court denied both requests. See Antaeus Enters., Inc. v. SD-Barn Real Estate, LLC, 396 F. Supp. 2d 408 (S.D.N.Y. 2005).  They then answered the complaint, denying liability and asserting various defenses and counterclaims.  The plaintiffs moved to dismiss the counterclaims, prompting SD-Barn and Davidson to voluntarily dismiss them.  The plaintiffs then moved for summary judgment on

their own claims.  In August 2006, before that motion was fully briefed, the parties stipulated that the full amount that NPE had deposited in the court's registry could be released to the plaintiffs (consistent with Davidson's assertion at his June 2006 deposition in that case that "they can have it all").

Following that stipulation, counsel for both SD-Barn and Davidson withdrew from the case.  Davidson continued, on a <u>pro se</u> basis, to defend the claims against him personally.  SD-Barn, however, did not retain new counsel or appear at any subsequent hearings, so the district court entered a default judgment against SD-Barn for $665,284.30 in damages, consisting mostly of the plaintiffs' alleged legal fees incurred in the litigation up to that point.  <u>See Antaeus Enters., Inc. v. SD-Barn Real Estate, LLC</u>, No. 05-6396 (S.D.N.Y. Apr. 11, 2007).  In the promissory notes, SD-Barn had "agree[d] to pay all costs of collection when incurred [by the DIP lenders], including reasonable attorney's fees."

Notwithstanding the default judgment against SD-Barn, the plaintiffs' motion for summary judgment against Davidson remained pending.  The district court granted it, finding Davidson personally liable for tortious interference with contract, in that he intentionally caused SD-Barn not to distribute NPE's payments <u>pro</u> <u>rata</u> to the other DIP lenders within the time specified in the promissory notes.  <u>See</u> <u>Antaeus Enters., Inc. v.</u>

11

SD-Barn Real Estate, LLC, 480 F. Supp. 2d 734 (S.D.N.Y. 2007).
Since the plaintiffs had already received their half of NPE's
principal payments from the court's registry, they were awarded
damages on that claim for only their half of the interest
payments (about $22,000).  The court refused to incorporate
plaintiffs' legal fees into the damages award, finding that
Davidson's arguments against liability, though "weak," were not
"vexatious or intended to prolong the litigation," nor "so
lacking in merit that Davidson should be punished for making
them."  Id. at 745-46.

     In an unusual procedural move, the plaintiffs appealed that
favorable judgment to the Second Circuit Court of Appeals.  They
were worried that, because they had amended their complaint
(while the summary judgment motion was pending) to add a veil-
piercing claim against Davidson, the judgment might be construed
to have res judicata effect on that claim, thus preventing them
from seeking to enforce the SD-Barn default judgment against
Davidson in a future action (and thereby preventing them from
recovering their legal fees).  The court of appeals, agreeing
that the veil-piercing claim had never been adjudicated, remanded
for consideration of that claim only, affirming the judgment in
all other respects.  See Antaeus Enters., Inc. v. SD-Barn Real

Estate, LLC, 305 Fed. Appx. 675, 677 (2d Cir. 2008).[6]  Then, on remand, the plaintiffs voluntarily dismissed the claim without prejudice.

Two of them, Antaeus and Rand, re-filed the veil-piercing claim against Davidson in this court in 2010, having been unable to collect the default judgment from SD-Barn (or even to collect the personal judgment from Davidson, as to which they filed an enforcement action in New Hampshire Superior Court[7]).  Without conducting any discovery, beyond that already conducted in the New York action, they moved for summary judgment, see Fed. R. Civ. P. 56, arguing that they are entitled to pierce SD-Barn's corporate veil as a matter of law.  This court will now turn to that issue.

---

[6]The court of appeals advised the district court, on remand, to "consider whether fairness to Davidson requires that the default judgment against SD-Barn should be reopened to permit Davidson to contest the amount for which he would be personally liable in the event that the veil-piercing claim is upheld." Antaeus, 305 Fed. Appx. at 677.  Antaeus and Rand have no objection to this court's conducting that inquiry, see document no. 17-1, at 17, and fairness does indeed require it, particularly in light of the fact that plaintiffs' claimed legal fees exceed the amount of their recovery.  Thus, the parties should be prepared to address the damages issue at trial, rather than assuming that the amount of the default judgment will control.

[7]Plaintiffs informed the court at oral argument that they recently received a payment from Davidson in satisfaction of that personal judgment.

### III.  **Analysis**

"Ordinarily, corporate owners are not liable for a corporation's debts" under New Hampshire law, barring an agreement to the contrary.  Norwood Group, Inc. v. Phillips, 149 N.H. 722, 724 (2003).  That limitation on personal liability is considered "one of the desirable and legitimate attributes of the corporate form of doing business."  LaMontagne, 150 N.H. at 275.  Courts "will pierce the corporate veil and assess individual liability, however, where the corporate identity has been used to promote an injustice or fraud."  Id.  It is the plaintiff's burden to prove that the corporate identity has been used in that manner.  See Village Press, 120 N.H. at 471.  "The doctrine of piercing the corporate veil is an equitable remedy and, therefore, is particularly within the province of the trial court."  LaMontagne, 150 N.H. at 274.

The New Hampshire Supreme Court has not yet considered a veil-piercing claim involving a limited liability company.  But another federal court in this district recently held, and this court agrees, that "it is likely that New Hampshire courts would permit piercing of the veil of an LLC under the same circumstances as permitted for corporations."  In re Gilbert, No. 06-10119, 2007 WL 397018, at *3 (Bankr. D.N.H. Feb. 1, 2007).  Neither party has argued for a different rule here.

14

Plaintiffs argue that it is appropriate to pierce the corporate veil because the summary judgment record shows that Davidson used SD-Barn to perpetrate a fraud and injustice, first by diverting to himself money that SD-Barn owed to them and then by mounting an aggressive and frivolous defense when they sued him and SD-Barn to recover the money.  They allege that his motives, in doing so, were to retaliate for the way they treated him in connection with PEC's demise and to give himself greater leverage in his separate suit against them in New Hampshire Superior Court.  It is true that the record could reasonably be construed to support such an inference.  And it is true that such conduct would warrant piercing the corporate veil.  See id. at 275 (affirming trial court's decision to pierce veil where owner "breached his promise to pay [plaintiff] without good cause," gave "disingenuous" and "bad faith" reasons for doing so, and most of the money went instead to the owner).

But that is not the only inference that one could reasonably draw from the summary judgment record.  As discussed in Part II, supra, Davidson has offered another, less sinister explanation: that he was distracted from SD-Barn's affairs by his daughter's death and his own severe health problems; that, rather than distributing NEP's two principal payments pro rata, he simply allocated the first payment to himself and the second payment to the other DIP lenders, knowing that they would all be fully paid

15

within a year; that he kept NPE's interest payments as reimbursement for legitimate expenses that SD-Barn had incurred in connection with the loan; that any minor adjustments necessary were to be made after a final accounting of the loan; and that his defense to the plaintiffs' suit was neither frivolous nor overly aggressive, according to the court that presided over it. See Antaeus, 480 F. Supp. 2d at 745-46.

Plaintiffs protest that Davidson's explanation for his conduct is not "credible." Document no. 17-1, at 10. But this court is not permitted to make credibility determinations at the summary judgment stage. Rather, as discussed in Part I, supra, it must "view the record in the light most favorable to [Davidson] and resolve all reasonable inferences in [his] favor, without weighing the evidence or evaluating the credibility of the witnesses." Sheehan v. N. Am. Mktg. Corp., 610 F.3d 144, 149 (1st Cir. 2010). Under that approach, it is clear that material facts remain in dispute, particularly regarding Davidson's intent. Plaintiffs have not presented "conclusive" proof that Davidson used SD-Barn to promote a fraud or injustice, as would be required to pierce the corporate veil at the summary judgment stage. See Zimmerman, 613 F.3d at 70.

Plaintiffs also point to a number of undisputed facts that, they say, support piercing the corporate veil, including that (1) Davidson had sole and exclusive control over SD-Barn; (2) SD-Barn

failed to observe corporate formalities, other than keeping
accounting records for the DIP loan; (3) SD-Barn was an admitted
"shell corporation" with no assets; and (4) SD-Barn intermingled
its affairs with those of Davidson's other businesses by using
their employees.  Those are indeed some of the relevant factors
that may be considered in determining whether to pierce the
corporate veil.  See, e.g., Border Brook Terrance Condo. Ass'n v.
Gladstone, 137 N.H. 11, 15 (1993); Walter L. Murphy & Daniel C.
Pope, New Hampshire Civil Jury Instructions § 36.1, at 36-2
(2007).

     Again, however, those factors are not necessarily
"conclusive," as would be required to pierce the corporate veil
on summary judgment.  Zimmerman, 613 F.3d at 70.  The New
Hampshire Supreme Court has made clear, for example, that
"piercing the corporate veil is not permitted solely because a
corporation is a one-man operation," unless there is "proof that
the [owner] conveyed property fraudulently . . . or that he
misled [creditors] as to the corporate assets."  Village Press,
120 N.H. at 471-72 (quotation omitted).  Similarly, the Supreme
Court has ruled that the corporate veil should not be pierced
based on a lack of corporate formality, unless the informality
was "intended to promote injustice or fraud."  Druding v. Allen,
122 N.H. 823, 828 (1982).  Since whether Davidson used SD-Barn to
promote fraud or injustice is a matter of genuine dispute on this

17

record, so too is the weight to be accorded each of these other factors.  Such disputes must be resolved at trial, not on summary judgment.

Finally, it is worth noting that, even if summary judgment were granted, trial would still be necessary to determine the amount of plaintiffs' damages, if any.  <u>See</u> note 6, <u>supra</u>.  That strengthens this court's conclusion that, under the circumstances of this case, with a <u>pro</u> <u>se</u> defendant, the best course is to deny summary judgment and proceed to trial on both liability and damages.


## IV.  **Expedited discovery**

Given that the parties have already conducted significant discovery (and each expended substantial resources) on this matter in the earlier action in New York, this court has determined that it is in the interest of justice to expedite discovery here.  <u>See</u> Fed. R. Civ. P. 26(b)(2).  Discovery shall proceed as follows:

• The parties shall have 90 days from the date of this order to conduct and complete discovery.

• Each side shall be confined to a maximum of 15 written interrogatories, 5 document requests, and 3 depositions (not including any expert depositions).  The interrogatories and document requests, if any, shall be propounded within 20 days of this order and answered within 20 days of receipt.

- Expert disclosures, if any, shall be made by the plaintiffs within 30 days of this order, and by the defendant within 30 days of receiving plaintiffs' disclosures, allowing time for the experts to be deposed before the close of discovery.

- The deadline for joinder of additional parties, amendment of pleadings, and disclosure by the defendant of claims that unnamed parties are at fault for the plaintiffs' claim, see DeBenedetto v. CLD Consulting Eng'rs, Inc., 153 N.H. 793 (2006), shall be 30 days from the date of this order.

- If necessary, the parties may seek leave of court to extend these deadlines or exceed these limitations, stating specifically the grounds for any such request. This court is mindful of the defendant's pro se status and physical limitations and is prepared to make reasonable accommodations to allow him full and fair discovery.

Discovery disputes will be handled by the undersigned judge, as opposed to the Magistrate Judge, in the normal course. No motion to compel is necessary. The party or counsel seeking discovery-related relief should confer with adverse counsel to choose mutually available dates, and then contact the Deputy Clerk to schedule a conference call with the court. The court will inform counsel and parties what written materials, if any, should be submitted in advance of the conference call.

Customary motions to compel discovery, while disfavored by the undersigned judge, are nonetheless permissible. If party or counsel prefer traditional discovery litigation to the conference call procedure set forth above, any such motion to compel should expressly request, in the title of the motion, a referral to the Magistrate Judge. Such referral requests will normally be

granted.  If the Magistrate Judge is recused, alternate arrangements will be made.


**V.  <u>Conclusion</u>**

   For the reasons set forth above, the plaintiffs' motion for summary judgment[8] is DENIED.  Discovery shall proceed on an expedited basis, consistent with Part IV of this order.


   **SO ORDERED.**

                                  _____
                                  Joseph N. Laplante
                                  United States District Judge

Dated:  March 29, 2011

cc:  David Himelfarb, Esq.
     Russell F. Hilliard, Esq.
     L. John Davidson, pro se

--------

   [8]Document no. 17.